AUSA: Steven P. Cares    Telephone: (313) 226-9139

AO 91 (Rev. 11/11) Criminal Complaint    Special Agent: Kaylee Barker, FBI    Telephone: (313) 268-2079

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America
v.
D-1) Tiffany Lipkovitch
D-2) Amber Bellamy

Case: 2:21-mj-30251
Assigned To : Unassigned
Date : 5/27/2021
CMP USA v SEALED (kcm)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___June 15, 2018 - September 25, 2018___ in the counties of ___Wayne and Oakland___ in the ___Eastern___ District of ___Michigan___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C., Sections 841(a)(1) and 846 | the distribution of a controlled substance and conspiring to distribute controlled substances. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

__ Continued on the attached sheet.

_____
*Complainant's signature*

Kaylee Barker, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _May 27, 2021_____

_____
*Judge's signature*

City and state: _Detroit, Michigan 48226____    Curtis Ivy, Jr., United States Magistrate Judge
*Printed name and title*

## **Affidavit in Support of a Criminal Complaint**

The affiant, Kaylee Barker, being duly sworn, deposes and states as follows:

## **INTRODUCTION**

1. I submit this affidavit in support of a complaint charging TIFFANY LIPKOVITCH, who was at the time of the conduct in the case a uniformed officer and is now a detective with the Highland Park Police Department, and her friend and drug supplier, AMBER BELLAMY, with the distribution of a controlled substance and conspiring to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) and § 846.

2. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since September 2019. I successfully completed the 21 weeks of New Agent Training at the FBI Academy in Quantico, Virginia in February 2020. I am currently assigned to the Public Corruption squad in the Detroit Division of the FBI. As a Special Agent, I have investigated

1

crimes including the corruption of state and local officials, civil rights violations, and fraud against the government. I was an Intelligence Analyst with the FBI from July 2017 up until becoming a Special Agent. As an Intelligence Analyst I worked Complex Financial Crimes cases and received training on Money Laundering Facilitation, Health Care Fraud, Financial Institution Fraud, Corporate Securities/Commodities Fraud, Intellectual Property Rights Fraud and Mortgage Fraud.

3. I make this affidavit from personal knowledge based on my participation in this investigation, including reports from other law enforcement agents, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or all facts of which I am aware relating to this investigation.

## PROBABLE CAUSE

4. On or about April 10, 2018, the FBI began to utilize CHS 1. The FBI was introduced to CHS 1 by the South Oakland Narcotics Intelligence Consortium Task Force (or "SONIC"). SONIC handlers

assessed CHS 1 to be reliable. In addition, for the reasons set forth in this affidavit, I believe that the information provided by CHS 1 is reliable.

5. CHS 1 provided agents with historical information about LIPKOVICH's and BELLAMY's criminal activities. Then, at the direction of agents, CHS 1 made consensual recorded phone calls and meetings with LIPKOVICH and BELLAMY, as discussed below, that ultimately led to CHS 1 purchasing fentanyl-laced heroin.

6. The calls were made to 313-989-7575, subscribed to by "Tiffany Lee" with an address of 14902 Harper Avenue, Detroit, Michigan, but known to be used by LIPKOVICH as confirmed by CHS 1, including based on the observations of LIPKOVICH during certain occasions set forth below.

7. On June 15, 2018, at approximately 12:05 p.m., CHS 1 conducted a consensually-recorded telephone call to LIPKOVITCH. The following is an excerpt of their conversation:

CHS 1: I gots to see you cause I had spoke with a few people and they just-- They kind of waiting on me. So I hope everything's still straight.
LIPKOVITCH: Mm-hmm. Uh-huh. Amber called me and told me to

3

call her. I'm gonna call her when I get off the phone with you.

8. Based on my training and experience, my discussions with other investigators, as well as the context of the call, I believe CHS 1 was attempting to broker a narcotics transaction with LIPKOVITCH, who responded that she would have to contact "Amber," who is now known to be BELLAMY.

9. On Saturday, June 30, 2018, at approximately 4:32 p.m., CHS 1 conducted a consensually-recorded telephone call to LIPKOVITCH. In that call, CHS 1 attempted to expedite the drug transaction. The following is an excerpt of that telephone call:

CHS 1: You think if I just went ahead and gave you . . . my money, (inaudible) holler at her?
LIPKOVITCH: Could you do what?
CHS 1: ...[I]f I just gave you my money, you think she'd ... move faster?
LIPKOVITCH: ... I don't know. But if you-- I won't want it all. I would just want some. You know what I'm sayin? ... Like, uh, good faith whatever. But I wouldn't give it to her until she did something. You know what I'm sayin? Like, whatever she had.

10. Based on my training and experience, my discussions with other investigators, and the context of the call, I believe CHS 1 was offering to provide money before getting the drugs to help the drug

4

transaction move faster. I also believe LIPKOVITCH advised that providing some money in advance would be a "good faith" act, but also advised not to provide all of the money ahead of time until CHS 1 received narcotics.

11. On July 11, 2018, at approximately 11:16 a.m., CHS 1 conducted a consensually-recorded telephone call to LIPKOVITCH. The following is an excerpt of their conversation:

CHS 1: I ended up doing something and getting a little bit of money . . . but if, if you can, uh, get with your girl, I need a, a (unintelligible).
LIPKOVITCH: I can't hear you.
CHS 1: I said I need this--to come bump into you. If you can bump into your girl before I start spending this money.
LIPKOVITCH: ... [O]kay, well, where do you want to meet and greet?

12. Based on my training and experience, discussions with other investigators, and the context of the call, I believe CHS 1 was trying to set up a meeting with LIPKOVITCH and BELLAMY (or "your girl") for a narcotics transaction.

13. On July 16, 2018, at approximately 12:26 p.m., CHS 1 conducted a consensually-recorded telephone call to LIPKOVITCH. The following is an excerpt of their conversation:

5

| | |
|---|---|
| CHS 1: | ... I'll be on my way down there at 1:30. Is that straight? |
| LIPKOVITCH: | ... [O]kay, I'll call and tell her we could meet at (unintelligible) casino or something. |
| CHS 1: | Yeah, that's good. |

14. Based on my training and experience, discussions with other investigators, and the context of the call, I believe LIPKOVITCH said she would arrange a meeting at the casino between BELLAMY and CHS 1.

15. On July 16, 2018, at approximately 1:41 p.m., CHS 1 conducted a consensually-recorded telephone call to LIPKOVITCH. The following is an excerpt of their conversation:

| | |
|---|---|
| CHS 1: | I'm on my way down that way. |
| LIPKOVITCH: | I was down there but why you didn't answer the phone? |
| CHS 1: | You was down there? |
| LIPKOVITCH: | Me and Amber. |
| CHS 1: | I told you I wasn't leaving this way til 1:30. |
| LIPKOVITCH: | Well, I thought you told me that you'd be down there no later than 1:30. |
| CHS 1: | ... I told you I would be down there ... [a] little later than 1:30 ... |
| LIPKOVITCH: | ... Let me call her and see where she at ... |

16. Based on my training and experience, discussions with other investigators, and the context of the call, I believe LIPKOVITCH and BELLAMY were waiting for CHS 1, but there was a miscommunication

6

about the meeting time for the drug transaction, so LIPKOVICH agreed to call BELLAMY to determine her whereabouts and reschedule it.

17. On July 17, 2018, CHS 1 was provided recording equipment for a scheduled meeting with LIPKOVITCH at a local casino. Prior to the meeting, CHS 1 was physically searched and transported to the meeting location by federal agents, who also surveilled the meeting. By the end of this meeting, LIPKOVITCH provided CHS 1 with three separate baggies of an unknown substance, described as "pictures." LIPKOVITCH told CHS 1 that these "pictures" were given to her by BELLAMY. In addition, LIPKOVITCH also discussed amounts, quality of the drugs, prices, and the need to traffic the narcotics. This meeting was recorded, and an excerpt of their conversation is as follows:

LIPKOVITCH: Amber gave me some samples ... some little pictures (unintelligible).
CHS 1: Wait til we get to the car, man, I ain't tryin' to talk in here.
LIPKOVITCH: But I'm sayin (unintelligible). She gave me four samples—two she wants $80 a gram and for the other two she wants $100 ... .
CHS 1: ... [D]id she say it can be cut? ... .
LIPKOVITCH: Ok she said, the one for eighty can be cut for half, but she was like, the one for hundred can take a one and a half. ... .
CHS 1: So hold on. The one for eighty can take a half? The one for a hundred can be taken one and a half?

7

| | |
|---|---|
| LIPKOVITCH: | One, one and half. |
| CHS 1: | So … [you] could cut it a hundred times? |
| LIPKOVITCH: | Exactly! |
| CHS 1: | Oh, so she must've just did the shit herself. |

. . . .

LIPKOVITCH: Ain't a penny for me to make. Motherfucker spending $100 on a motherfucking gram. … You gonna give me $5 for, uh, girl please. It ain't gonna work for me to fuck with nobody else about this shit. Just because it was some three, four pictures or whatever. I'm giving them to you because I ain't giving them to two people cause I ain't even gonna tell nobody them prices! So, hopefully you could make a couple $100 off of it … .

18. Based on my training and experience, and discussions with other investigators, I believe LIPKOVITCH and CHS 1 were talking about samples or "pictures" of drugs that LIPKOVITCH obtained from "Amber," who I believe to be BELLAMY. (After the meeting, CHS 1 was physically searched by federal agents and the three separate baggies given to CHS 1 by LIPKOVITCH were recovered and submitted for testing. On July 17, 2018, these drugs were analyzed by the Oakland County Sheriff's Office and confirmed to be a mix of heroin and fentanyl.) I further believe that, in the conversation, LIPKOVITCH is complaining that the price charged by BELLAMY for heroin (or "girl") was high so LIPKOVITCH cannot make any money from selling or

8

brokering them, i.e., she was not even going to bother talking or giving them to her other customers because of the high price, but nonetheless agreed to broker the deal for CHS 1.

19. On July 19, 2018 at approximately 9:06 a.m., a consensually-recorded conversation is captured between CHS 1 and LIPKOVITCH arranging a meeting time and location. In this conversation, LIPKOVITCH told CHS 1 that she was at work and they agreed to meet "at the park," after she was done.

20. On July 19, 2018, CHS 1 was provided recording equipment for the previously-scheduled meeting with LIPKOVITCH. This meeting was surveilled by federal agents. This interaction was recorded, and excerpts of their conversation are set forth below:

LIPKOVITCH: What's that stuff that ya'll cuttin' with ... ?
CHS 1: Fentanyl.
LIPKOVITCH: Fentanyl. He was ordering it from overseas having it UPS right to Amber's front door.
CHS 1: Mmm.
LIPKOVITCH: That's why he gave her $40,000 cause he had a package of fentanyl coming from overseas to her front door. I don't know how he was just ordering it.
. . . .
LIPKOVITCH: I'm tryin' to figure it out, cause we sittin' here talking about-- do you want some shit or no?
CHS 1: Yeah!
LIPKOVITCH: Ok, but you ain't got no money to buy right now.

9

CHS 1:       I'm gonna buy some.
LIPKOVITCH:   Oh, ok . . . just let me know when. I'll get it. I'll make sure to get it for you or whatever.

21. Based on my training and experience, and discussions with other investigators, I believe LIPKOVITCH and CHS 1 were talking about mixing heroin and fentanyl, and LIPKOVITCH was telling CHS 1 that an associate of "Amber" or BELLAMY was getting fentanyl through UPS. I further believe that CHS 1 was telling LIPKOVITCH that CHS 1 was going to purchase some quantity of drugs.

## BELLAMY provides CHS 1 with 45 grams of fentanyl-laced heroin

22. On July 25, 2018, at approximately 4:10 p.m., CHS 1 conducted a consensually-recorded telephone call to LIPKOVITCH. During this call, CHS 1 and LIPKOVITCH talked about a meeting the following day, or on July 26, 2018, at a park in Detroit, Michigan with BELLAMY.

23. The next day, or on July 26, 2018, at approximately 12:12 p.m., CHS 1 conducted a consensually-recorded telephone call to LIPKOVITCH. During this call, LIPKOVICH said that BELLAMY "should be pulling up" to CHS 1 so that CHS 1 "can talk to her." CHS 1 then agreed to talk to LIPKOVICH after the meeting.

24. Shortly after this call, at approximately 12:25 p.m., law enforcement surveillance observed a black Jeep Cherokee bearing Michigan license plate "CCZ 214," registered to BELLAMY, pull into the driveway of Salter Park, the park where CHS 1 was waiting to meet BELLAMY. Agents also observed a female meet with CHS 1 for a short period of time. CHS 1 later identified this female as BELLAMY. During the meeting, CHS 1 told BELLAMY that "I need 50 grams." BELLAMY responded that "I can get it." Based on my training and experience, I

believe that CHS 1 and BELLAMY were arranging a 50-gram narcotics transaction. Later on in the conversation, CHS 1 and BELLAMY exchanged contact information.

25. BELLAMY left the park and returned about 40 minutes later, at approximately 1:05 p.m. This second meeting was also recorded, and an excerpt of their conversation is as follows:

| | |
|---|---|
| BELLAMY: | … [W]ell, I just want to make sure which one you wanted. Cause she said she gave you two, right? |
| CHS 1: | It was three, I guess. |
| BELLAMY: | She gave you three? Damn. That is crazy! … . |
| CHS 1: | … [S]he said two of 'em was the same, but … the brown one-- |
| BELLAMY: | The brown one? |
| CHS 1: | It was, like, a brown-- |
| BELLAMY: | Yeah, it was darker. |
| CHS 1: | Yeah. |
| BELLAMY: | You want that one? |
| CHS 1: | Yeah. |
| BELLAMY: | Ok. |
| CHS 1: | The one for eighty. |
| BELLAMY: | The one for eighty? |
| CHS 1: | Yeah. |
| BELLAMY: | Ok. |
| | …. |
| CHS 1: | You can't get it stronger for me? … . |
| BELLAMY: | Yeah. Yeah, um, let me see. |
| CHS 1: | But … I'm cool with this cause … whatever I did, it worked. You know what I mean? |
| BELLAMY: | It worked on the eighty, whatever you did. Ok. Did you try it on the hundred? |
| CHS 1: | Yeah, I mean, yeah but-- |

| | |
|---|---|
| BELLAMY: | There was no difference? |
| CHS 1: | Not for what I was trying to do, nah. There really wasn't. |
| BELLAMY: | Ok. So, we got this other shit too, um, we got this other shit that's stronger. Even ... with it not touched at all, the other one is stronger. Not touched at all ... . [B]ut, ... I ain't give no picture for that one cause I'm tryin' to sell the shit I gave you a picture for. ... [B]ut ... what I can do is get you still what you want ... and then get you a picture of the other shit. |

26. Based on my training and experience, I believe BELLAMY was trying to clarify which type of drug that CHS 1 wanted—i.e., which of the samples that LIPKOVICH previously delivered—and they confirmed CHS 1 wanted the "darker" colored or "brown" one that BELLAMY was selling for $80 per gram. I also believe that CHS 1 inquired about more potent or "stronger" heroin/fentanyl, and BELLAMY agreed that she had stronger stuff, but had not given LIPKOVICH a sample of this kind. I believe BELLAMY agreed to go get 50 grams of the "brown" one and to also bring a sample of the stronger one.

27. During this meeting BELLAMY received a phone call (which was captured on CHS 1's recording device) where BELLAMY said that she was "with him right now" and it was her "second time up here."

13

Around this same time, or more specifically on July 26, 2018, at 1:11 p.m., toll records show a telephone call from 313-989-7575, which is used by LIPKOVICH, to 313-629-8095, a telephone number known to be used by BELLAMY. Based on my training and experience, I believe that, in this conversation, BELLAMY was confirming to LIPKOVITCH that she was meeting with CHS 1.

28. On July 26, 2018, at approximately 2:22 p.m., CHS 1 conducted a consensually-recorded telephone call to LIPKOVICH. During the call, CHS 1 asked if LIPKOVICH could "just see where she [sic] at or what's going on" and LIPKOVICH agreed and said she would "call her." Approximately one minute later, toll records show a call from 313-989-7575 to telephone number 313-629-8095, a phone known to be used by BELLAMY. Based on my training and experience, I believe CHS 1 asked LIPKOVICH to determine where BELLAMY was and relay information to CHS 1, and so LIPKOVICH subsequently called BELLAMY to get that information.

29. Eventually, CHS 1 learned from LIPKOVITCH that CHS 1 could leave the park. And at approximately 3:00 p.m., BELLAMY called CHS 1 and the two agreed to meet later at a Target store in Novi,

14

Michigan.

30. On July 26, 2018, at approximately 4:54 p.m., prior to this meeting, federal agents physically searched CHS 1, outfitted CHS 1 with recording devices, and gave CHS 1 $4,000 in United States currency to purchase the drugs from BELLAMY.

31. At approximately 5:04 p.m., surveillance observed BELLAMY's vehicle located at the Target store in Novi, Michigan. BELLAMY was observed by federal agents as the passenger of the vehicle and UNKNOWN FEMALE was observed as the driver of the vehicle.

32. On July 26, 2018, at approximately 5:07 p.m., CHS 1 was observed by federal agents entering BELLAMY's vehicle. During the course of this recorded interaction, BELLAMY sold narcotics to CHS 1 in exchange for $3,200 in United States currency. This interaction was recorded, and excerpts of their conversation are set forth below:

| | |
|---|---|
| BELLAMY: | … It's 40. |
| CHS 1: | 40? |
| BELLAMY: | Yeah cause … , he's takin too long. I'm just like "give me what you got" … |
| CHS 1: | Is it still straight? |
| BELLAMY: | Oh no, no. It's better. … [B]ut … remember what I told you about the other one--even better than that. … The |

> hundred boy for the other one.
>
> ....
>
> CHS 1: Oh, you didn't get that ... little sample?
> BELLAMY: Right cause he was takin' too long.
> CHS 1: Oh, okay.
> BELLAMY: ... I'm like "just give me what the fuck you got cause you takin' forever." ... I have the other one tomorrow anyway.

33. Based on my training and experience, I believe BELLAMY and CHS 1 were discussing drugs that BELLAMY brought. More specifically, I believe that BELLAMY told CHS 1 that she only brought 40 grams of the drug, and did not bring the sample of the stronger type they previously discussed, because her supplier was taking a long time.

34. After the meeting, agents observed CHS 1 departing the vehicle, into the Target store, and then to a predetermined meeting spot. Agents then physically searched CHS 1 and recovered the suspected drugs that BELLAMY gave to CHS 1. On July 26, 2018, the substance was analyzed by the Oakland County Sheriff's Office and confirmed to be 45 grams of a mixture consisting of heroin and fentanyl.

35. On September 25, 2018, the FBI provided $300 in United States currency to CHS 1 for an established meeting with LIPKOVITCH. CHS 1 was to pay LIPKOVITCH for connecting CHS 1

to BELLAMY, which resulted in the purchase of illegal narcotics on July 26, 2018. This meeting between CHS 1 and LIPKOVITCH, who was on duty with the HPPD and dressed in a police uniform, was recorded by federal agents, and the following is a summary of this conversation which took place inside a gas station in Highland Park, Michigan. This interaction was recorded. During the meeting CHS 1 provided the cash to LIPKOVITCH and told her it was for "hooking me up with Amber."

36. Store video also shows LIPKOVITCH was wearing her HPPD uniform when an exchange of cash occurred. A screen shot of the video is set forth below:



37. In addition, the FBI video recording show a parked HPPD police car parked outside of the meeting location. LIPKOVITCH told CHS 1 that her partner (unidentified) was in the vehicle at the time of their meeting, which ended because LIPKOVITCH said she had to respond to a police call at a local bank

## CONCLUSION

38. Based on the information stated above, there is probable cause to believe that TIFFANY LIPKOVITCH and AMBER BELLAMY distributed a controlled substance and conspired to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) and § 846.

*Kaylee Barker*
Kaylee Barker, Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in
my presence and/or by reliable
electronic means.

Honorable Curtis Ivy, Jr.
United States Magistrate Judge
Eastern District of Michigan

Dated: May 27, 2021

18